United States District Court
District Of Maine

Moses Sebunya,                )
                             )
            Plaintiff,        )
                             )
v.                           )        Docket No.
                             )
Chad Wolf,                   )
Acting Secretary,            )
Department of Homeland       )
Security,                    )
                             )
            Defendant.       )

## Complaint and Demand for Jury Trial
## and Injunctive Relief Sought

Moses Sebunya brings this action against Chad Wolf, in his official

capacity as the Acting Secretary of the Department of Homeland Security, an

agency of the United States of America, and states as follows:

## Summary of Civil Rights Case
## for Discrimination and Retaliation

1.      Moses Sebunya was an Equal Rights Officer of the Federal

Emergency Management Agency (FEMA), within the United States

Department of Homeland Security. On June 20, 2017, Mr. Sebunya was

involuntarily removed from a deployment in Missouri—causing him lost

wages and damage to his reputation and professional career—because of (1)

his participation in a pending equal employment opportunity (EEO)

investigation; (2) his race (Black); and (3) his ongoing opposition to unlawful race discrimination against Black people and other people of color including but not limited to his service as the President of a branch of the NAACP.

2.     On June 20, 2017, Mr. Sebunya told his supervisor that he was planning to file an EEO complaint about his involuntary removal from deployment. After that, he was subjected to an ongoing retaliatory hostile work environment and a series of retaliatory adverse actions, including but not limited to, the unexplained and abrupt cancellations of deployments, the failure to be deployed when his seniority and expertise warranted his deployment, and the violation of his right to pursue an internal EEO complaint when all deployed members of the Equal Rights cadre were notified that he had filed an internal EEO complaint about his demobilization on June 20, 2017.

3.     Mr. Sebunya filed a complaint with the Equal Employment Opportunity Commission (EEOC) and administratively exhausted this claim. Immediately after the close of evidence in his EEOC matter, Mr. Sebunya was notified that his contract was being nonrenewed. Mr. Sebunya filed a separate complaint with the EEOC regarding that termination. That complaint is currently pending with the EEOC.

## The Parties

4.     Plaintiff Moses A. Sebunya is a citizen of the United States and is a resident of Portland, Cumberland County, Maine.

5.     Defendant, Acting Secretary Chad Wolf, is sued in his official capacity as the duly appointed head of the Department of Homeland Security of the United States of America.

## Jury Trial Demand

6.     Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

7.     This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1341 (federal question) and 1343 (civil rights).

8.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(e) because Plaintiff resides in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland.

## Facts

9.     Moses Sebunya incorporates by reference the administrative record in his EEOC case, Agency Case No. HS-FEMA-02592-2017, EEOC

Case No. 570-2019-00366X.

10.     Moses Sebunya is a Black American citizen who was born in Uganda and follows the Muslim faith.

11.     Mr. Sebunya was an Equal Rights Adviser (also referred to as an Equal Rights Officer or Equal Rights Specialist) of the Federal Emergency Management Agency (FEMA), United States Department of Homeland Security for more than two decades.

12.      He was classified by FEMA as an E-2 and was based out of FEMA Headquarters in Washington, D.C., and worked as a reservist that served as a disaster assistance employee.

13.     In June 2017, he was deployed to Missouri and was working there for FEMA.

14.     On June 14, 2017, Mr. Sebunya met with a FEMA employee, Shelli Holmes, who asked for his help in determining how to respond to discriminatory behavior by her lead, Lesley Anne Ezelle. Ms. Holmes told Mr. Sebunya that she had been passed over several times for a leadership position which was awarded to someone who was less qualified. Ms. Holmes, who is Black, reported that she believed Ms. Ezelle, who is white, was treating Ms. Holmes less favorably based on her race (Black).

15.     On about June 16, 2017, Ms. Ezelle filed a complaint against her boss, Alana Reed, for undermining her authority and creating a hostile work

4

environment, claiming that she felt threatened by Ms. Reed.

16.     Mr. Sebunya met with Ms. Ezelle, who was seeking guidance regarding a need to demobilize employees to Arkansas. Mr. Sebunya advised Ms. Ezelle to consult with the four Disability Integration Advisers that had filed EEO complaints against her to avoid the appearance of retaliation.

17.     Mr. Sebunya was aware that Disability Integration Advisors Kenny R. Gordon, Shelli Holmes, Mauldin Yvonne, and Forishi Nji had each filed separate EEO complaints against Ms. Ezelle. He suggested that Ms. Ezelle should ask those employees with pending EEO complaints if they were interested in being assigned to the new disaster unit in Arkansas, noting that one of the complainants had previously expressed interest in going to Arkansas.

18.     On June 16, 2017, Mr. Sebunya received a call from complainant Shelli Holmes and she sounded very upset. She explained that she had been pulled into a conference meeting with the Chief of Staff (COS) Raymond Hetheringon, Ms. Ezelle, Regional Disability Integration Advisor Lisa Bothwell, and possibly an attorney. Ms. Holmes felt she was being intimidated and threatened into demobilizing to Arkansas. She denied ever expressing interest in moving to Arkansas.

19.     Mr. Sebunya advised Ms. Holmes to send an email to all parties involved clearly stating her position on the move to Arkansas to avoid any

possible "he said, she said" confusion.

20.     Later that day, Mr. Sebunya received a copy of the email that Ms. Holmes sent to Mr. Hetherington and the other individuals involved in the meeting. Before he had a chance to read it, Mr. Hetherington (a white male) walked into Mr. Sebunya's office and said that he wanted to give Mr. Sebunya a heads up that they were considering moving Ms. Holmes to Arkansas because she had the skills that were needed in that position.

21.     Mr. Sebunya told Mr. Hetherington that he had tried to help Ms. Ezelle make an informed decision about whom to send to Arkansas without being fogged by emotion perhaps relating to the pending EEO complaints.

22.     Mr. Sebunya further told Mr. Hetherington that he had explained to EEO complainant Ms. Holmes that not all things that are annoying, upsetting, or uncomfortable are illegal discrimination.

23.     To explain to Mr. Hetherington his efforts to educate Ms. Holmes that not all mistreatment in the workplace is illegal, Mr. Sebunya shared with him that when he was President of a branch of the National Association for the Advancement of Colored People (NAACP) in Maine, there had been a public controversy when the State Attorney General had decided not to press criminal charges against the KKK when they marched through the neighborhood of a Black man. In that situation, Mr. Sebunya expressed to the

press and media that he agreed with the AG's ruling because even though the actions were upsetting and immoral, they were not illegal.

24.     After that conversation, Mr. Hetherington called Roslyn Dunn-Alexander, Cadre Coordinator of the Equal Rights Advisors and Mr. Sebunya's immediate supervisor, at FEMA headquarters in Washington, D.C. Mr. Hetherington told her about his conversation with Mr. Sebunya and claimed that by interjecting mention of the KKK into the conversation, he felt Mr. Sebunya had created an "uncomfortable," "threatening" environment, and was "possibly promoting a confrontational environment."

25.     Mr. Hetherington claimed that because of Mr. Sebunya's mention of the KKK, he had a lack of confidence in Mr. Sebunya's abilities to work with the Office of Equal Rights (OER). He further claimed that he did not believe that Mr. Sebunya was fit to be an effective ERA (Equal Rights Advisor) for the Missouri operation.

26.     As a result of Mr. Hetherington's complaint to Ms. Dunn-Alexander, on June 20, 2017, Ms. Dunn-Alexander directed Mr. Sebunya by phone and email to complete his site assignment inspection on June 20, 2017, demobilize on June 21, 2017, and begin travel on June 22, 2017. In a June 20 email, Ms. Dunn-Alexander cited the reason for the demobilization as the complaint raised by Mr. Hetherington about his conversation with Mr. Sebunya, which allegedly "created an uncomfortable, threating [sic] and

7

possibly promoting [sic] a confrontational environment," inconsistent with the OER responsibilities and in violation of the agency's supposed "zero tolerance policy."

27.    Mr. Sebunya was shocked that his boss had agreed to terminate his deployment in the middle of his handling Ms. Holmes's EEO complaint, based on the complaint of a management official about Mr. Sebunya's protected activity of participating in the investigation of possible retaliation against Ms. Holmes. In addition, Mr. Sebunya's reference to his prior protected activity of serving as the President of a branch of the NAACP did not provide a legitimate basis for the abrupt termination of his deployment in Missouri.

28.    The sequence and timing of these events shows that Mr. Hetherington was retaliating against Mr. Sebunya for trying to help Ms. Holmes when she was feeling threatened and retaliated against based on her race and complaints of illegal race discrimination.

29.    Contemporaneous emails prove that during the EEOC investigation of Mr. Sebunya's complaint, Mr. Hetherington was untruthful in his affidavit to the EEOC investigator when he stated that he did not know the names of disability integration officers at the Missouri job site, and that he was not familiar with the name of Shelli Holmes. Documentary evidence proves that Ms. Holmes met with Mr. Hetherington in June 2017, before Mr.

8

Hetherington met with Mr. Sebunya and before Mr. Sebunya was removed from his assignment in Missouri.

30.     Equally telling of pretext for unlawful discrimination, Mr. Hetherington falsely covered up his knowledge of Mr. Sebunya's EEO assistance of Shelli Holmes in an email he sent to Roslyn Dunn-Alexander on June 21, 2017 (which is attached to the EEOC investigator's report), in which he stated in part that "Attached is the eval [of Mr. Sebunya] with employee comment. I was a bit lost on what obstruction he is talking about as **I was not aware of any portion of an investigation he was conducting**" (emphasis added).

31.     That Mr. Hetherington would falsely state that he did not know about the EEO investigation demonstrates that he was intentionally covering up the truth that he was there expressly to interfere with Mr. Sebunya's investigation for complainant Shelli Holmes.

32.     Mr. Hetherington's reasons for requesting that Mr. Sebunya be demobilized, and Roslyn Dunn-Alexander's rubber-stamping of those reasons after conducting no independent investigation or reasoning, demonstrates that there was no just cause for demobilizing Mr. Sebunya and that the reasons were most likely fabricated to cover the true retaliatory purpose of the reassignment.

33.     The claimed "uncomfortable" feeling of a white management official, Mr. Hetherington, in response to a comment by a Black Equal Rights Advisor, Mr. Sebunya, referencing the KKK is objectively unreasonable and not a legitimate reason to abruptly and permanently remove Mr. Sebunya from his assignment, temporarily putting him out of work. Simply referencing the KKK, particularly to a white man and in the neutral context in which Mr. Sebunya referenced the KKK, would not be threatening or confrontational to a reasonable supervisor.

34.     As a supervisor in the OER, it was even more unreasonable for Ms. Dunn-Alexander to base Mr. Sebunya's demobilization on Mr. Hetherington's alleged "uncomfortable" feeling. Ms. Dunn-Alexander never explained why and how she believes that Mr. Sebunya's comments "created an uncomfortable, threating [sic] and possibly promoting [sic] a confrontational environment," nor how Mr. Sebunya's actions related in any way to a supposed "agency zero tolerance policy."

35.     Another complaint made by Mr. Hetherington in his June 19 email to Ms. Dunn-Alexander—that Mr. Sebunya moved the location of a file cabinet in his office—strains credulity as a basis for removing someone from an assignment.

36.     Combined, these points demonstrate that Mr. Hetherington retaliated against Mr. Sebunya for conducting an EEO investigation into him

10

and his management staff and fabricated an alternative basis for having Mr. Sebunya demobilized. Mr. Hetherington was untruthful about his knowledge of the EEO investigation, about the reason he went to Mr. Sebunya's office, and about what Mr. Sebunya told him during their meeting, and he concocted artificial and unbelievable reasons for having Mr. Sebunya demobilized.

37.    Mr. Sebunya had an exit interview at the Joint Field Office (JFO) in Missouri with Mr. Michael Parker, Federal Coordinating Officer, who started by asking Mr. Sebunya how the JFO was doing. Mr. Sebunya told Mr. Parker that the Chief of Staff, Mr. Hetherington, had crossed the line and went into Mr. Sebunya's lane by calling an EEO complainant to engage her while there was an ongoing EEO inquiry that Mr. Sebunya was conducting.

38.    Mr. Sebunya told Mr. Parker that Mr. Hetherington was obstructing his EEO activities by interfering with his work. Mr. Parker did not necessarily agree with the term obstruction, but he agreed that there was a need to educate employees at that JFO location about the role of an ERA and that he was going to address the issues with the team.

39.    After listening to the reason why Mr. Sebunya was being demobilized, Mr. Parker told Mr. Sebunya that it was the same conversation Mr. Sebunya had with him nine years before in Iowa in 2009. He went further to state that he understood in Mr. Sebunya's example that Mr.

Sebunya was trying to express that he did not side with the Attorney General of Maine but he sided with logic and the law.

40.    During Mr. Sebunya's phone call with his boss, Ms. Dunn-Alexander, on June 20, 2017, Mr. Sebunya told her that he was planning to file an EEO complaint about his involuntary removal from his deployment. She documented his notice to her of his intent to file an EEO complaint in her email to him on June 20, 2017.

41.    After Mr. Sebunya was demobilized effective June 21, 2017, in Mr. Sebunya's very next deployment to California, he was subjected to adverse and unusual conditions. Mr. Sebunya was given oral instructions from Ms. Dunn-Alexander to arrive in California on June 28, 2017, for the start of his deployment. But when Mr. Sebunya arrived in California on June 28, he was told by Mary Bowden that his assignment had been changed and he was not scheduled to arrive for his deployment until July 8.

42.    Mr. Sebunya spoke with the Chief of Staff in California about the confusion in his deployment date and asked her to contact Ms. Dunn-Alexander for clarification. The Chief of Staff told Mr. Sebunya that because he self-deployed to California earlier than scheduled, he was going to be demobilized and sent home to Maine.

43.    After that, Mr. Sebunya was repeatedly offered deployments and then abruptly had those assignments cancelled under suspicious

12

circumstances. For example, Mr. Sebunya had an assignment to Florida canceled in October; he was told to stand down on a deployment to California on about October 27; and on November 28, he was assigned to a less favorable virtual deployment in South Carolina, and he was prevented from swapping for an assignment to Puerto Rico with a fellow OER advisor who wanted to take Mr. Sebunya's virtual assignment in South Carolina. Mr. Sebunya also has reason to believe that he was passed over for deployments in favor of less senior and less qualified co-workers in the Equal Rights cadre.

44.    Mr. Sebunya also faced public reprisal for his EEO complaint. On September 20, 2017, an official email was sent by Suzanne Miller to Mr. Sebunya's co-workers (all deployed members of the Equal Rights cadre) notifying them that he had filed an internal EEO complaint about his demobilization on June 20, 2017. Mr. Sebunya sent an email to his superiors the next day, September 21, raising questions about this act of retaliation, to which he never received a response.

45.    While the EEOC investigation produced evidence that Ms. Miller's supervisor, Nicole Oke, emailed her to tell her that the email should not have been sent to Mr. Sebunya's cohorts, no one provided any updates to Mr. Sebunya. Ms. Miller claimed in response to Ms. Oke that she did not intend to press "reply all" when she sent her email outing Mr. Sebunya for filing an EEO Complaint, but those behind-the-scenes emails did not

13

ameliorate the retaliatory effect of Ms. Miller's email to all of the ERAs, as

Mr. Sebunya and the other ERAs never heard that explanation.

46.     Ms. Miller's email publicly exposed Mr. Sebunya to his coworkers

for filing an EEO complaint, creating the appearance to both Mr. Sebunya

and his cohort that he was being retaliated against for his protected conduct.

If OER management wanted to address that appearance of retaliation, they

should have sent a follow-up email to the group clarifying that Ms. Miller's

email was sent in error and that there should be confidentiality for ERAs who

file EEO complaints.

47.     At the very least, that point should have been communicated to

Mr. Sebunya, particularly since he had sent an email to FEMA managers

asking why Ms. Miller's email had been sent to his entire cohort. Instead, the

incident had the effect of further retaliating against Mr. Sebunya, since Ms.

Miller's email created the reasonable impression that he was being outed to

his fellow advisors because he filed an EEO complaint, which could dissuade

a reasonable person from filing an EEO complaint.

48.     On November 9 and November 20, 2017, Mr. Sebunya sent

emails to Regis Phelan, Acting Director of the Office of Civil Rights, FEMA,

DHS, reporting the ongoing retaliation in violation of his EEO rights. Mr.

Sebunya never received a substantive response to those emails.

49.     Furthermore, FEMA documents attached to the EEOC investigator's report show that Ms. Dunn-Alexander repeatedly tried to officially discipline Mr. Sebunya, but that the Acting Deputy Director at that time, James Montgomery, disagreed with her. Ms. Dunn-Alexander first attempted to send Mr. Sebunya a reprimand in June 2017, which went nowhere. Later, in November 2017, she twice sent a draft letter of reprimand to Mr. Montgomery. According to the EEOC investigator's record, Mr. Montgomery never responded. Mr. Montgomery apparently knew that demobilizing Mr. Sebunya, let alone bringing official discipline against him, was unjustified.

50.     Ms. Dunn-Alexander has engaged in a pattern of retaliating against ERAs in violation of the anti-retaliation provisions in federal employment law. Besides Mr. Sebunya, other ERAs have made complaints about her unlawful retaliation.

## Exhaustion of Administrative Procedures

51.     Mr. Sebunya filed a formal complaint with the Equal Employment Opportunity Commission on December 7, 2017. The complaint brought claims for discrimination and retaliation/reprisal related to Mr. Sebunya's demobilization from Missouri, his announcement to Roslyn Dunn-

Alexander that he would be filing an EEO charge, and the retaliation that followed. A Final Agency Decision was issued on May 1, 2020.

52.    Thus, Mr. Sebunya exhausted all administrative procedures for all claims in this action that require administrative exhaustion.

## Count I

## Unlawful Discrimination Based on Race and Color

53.    The allegations in paragraphs 1-52 are realleged.

54.    Mr. Sebunya was discriminated against on the basis of his race. He was allegedly demobilized because he, a Black person, referenced the KKK to Mr. Hetherington, a white person. The implication is that his race somehow made this statement threatening or caused discomfort. As a result, he was removed from an assignment in circumstances where a white employee would not have been.

55.    Defendant intentionally discriminated against Mr. Sebunya and subjected him to a hostile work environment because of his race and color, and in retaliation for his complaint of race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

56.    Mr. Sebunya is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial and direct

evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

57.     As a direct and proximate result of Defendant's intentional discrimination, Mr. Sebunya has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

## Count II

### Unlawful Retaliation and Reprisal Based on Participation in EEO Investigation and Filing of EEO Complaint

58.     The allegations in paragraphs 1-57 are realleged.

59.     The evidence demonstrates that Mr. Sebunya was demobilized because he was investigating an EEO complaint against managers at the Missouri FEMA site. As a result, the demobilization constituted reprisal for Mr. Sebunya's participation in the EEO process, in violation of 42 U.S.C. § 2000e-3(a). Mr. Sebunya faced additional retaliation after he filed an EEO complaint in response to his June 20 demobilization, resulting in further violations of Section 2000e-3(a).

60.    Defendant intentionally retaliated against Mr. Sebunya and subjected him to reprisal for his participation in an EEO investigation on behalf of Shelli Holmes and for filing his own EEO charge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

61.    Mr. Sebunya is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

62.    As a direct and proximate result of Defendant's intentional discrimination, Mr. Sebunya has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of his job and of his life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

## Request for Relief

63.  Mr. Sebunya requests relief against Defendant as follows:

   a. Declare that Defendant violated Mr. Sebunya's statutory civil rights to be free from race and color discrimination and retaliation;

   b.  Enter injunctive relief ordering Defendant to complete effective civil rights training on the requirements of all applicable laws prohibiting employment discrimination because of religion, race, ancestry, color, and national origin and retaliation within 60 days of the entry of Judgment for Injunctive Relief, and every two years after the date of the entry of judgment;

   c.  Award Mr. Sebunya back pay for lost wages and benefits and prejudgment interest on those amounts;

   d.  Award Mr. Sebunya compensatory damages in amounts to be determined at trial by the jury;

   e.  Award Mr. Sebunya punitive damages in amounts to be determined at trial by the jury;

   f.  Award Mr. Sebunya full expenses and reasonable attorney's fees;

   g.  Award Mr. Sebunya prejudgment interest; and

   h.  Award such further relief as is deemed appropriate.


Date:  July 30, 2020                    Respectfully submitted,


                                     /s/ David G. Webbert
                                     David G. Webbert, Esq.
                                     Johnson, Webbert & Young, LLP
                                     160 Capitol Street, P.O. Box 79
                                     Augusta, Maine 04332-0079
                                     Tel: 207-623-5110
                                     dwebbert@work.law

/s/ Braden A. Beard
Braden A. Beard, Esq.
Johnson, Webbert & Young, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04332-0079
Tel: 207-623-5110
bbeard@work.law

*Attorneys for Plaintiff*